IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERRIE GORA, | ) | Case No. 1:18-CV-2987 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Terrie Gora, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her application for supplemental security income ("SSI") under Title

XVI of the Social Security Act.[1]  This matter is before me pursuant to 42 U.S.C. §§ 405(g) and

the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF

Doc. 11.  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards

and failed to build a logical bridge between the evidence and his decision, the Commissioner's

final decision denying Gora's application for SSI must be VACATED and Gora's case must be

REMANDED for further consideration.

---

[1] The administrative transcript is in ECF Doc. 9.  Gora previously filed a claim for SSI, which was
denied in a March 12, 2015 decision.  ALJ William Leland determined that new and material evidence
had become available since the last decision, thereby freeing him from having to follow the earlier
findings relevant to Gora's severe impairments; and Gora does not raise this finding as an issue on appeal.
(Tr. 295).

## II.     Procedural History

On September 29, 2016, Gora protectively applied for SSI.  (Tr. 494).  Gora alleged that she became disabled on March 13, 2015 due to depression, back pain, "carpal tunnel in both arms," "hernia disc," arthritis in back, heart aorta valve problem, long QT syndrome, pinched nerve in neck, asthma, bronchitis, "cist and tumor" on right foot, spinal meningitis, narrowing of the spine, right thumb pain, anxiety and she couldn't be around a lot of people.  (Tr. 494, 512). The Social Security Administration denied Gora's application initially and upon reconsideration. (Tr. 431-443).  Gora requested an administrative hearing.  (Tr. 447).  ALJ William Leland heard Gora's case on March 16, 2018 and denied the claim in a July 31, 2018, decision.  (Tr. 292-377). On October 26, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On December 30, 2018, Gora filed a complaint challenging the Commissioner's decision.  ECF Doc. 1.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Gora was born on April 15, 1968 and was 49 years old at the time of the administrative hearing.  (Tr. 494).  She quit school in seventh grade and did not obtain her GED.  (Tr. 349). She had never obtained her driver's license and had never had a job.  (Tr. 348-349).

### B.     Relevant Medical Evidence

#### 1.     Physical Limitations

On July 1, 2016, Gora saw Shauna Pagel, CNP, at MetroHealth for right elbow and arm pain that had lasted for three weeks.  (Tr. 647).  She saw Dr. Arjun Dhoopar on July 27, 2016 with similar complaints.  (Tr. 640-641).  Dr. Dhoopar noted that an x-ray was unremarkable. Gora reported living and caring for her parents including lifting them because of their age.  She

was not exercising.  (Tr. 640).  Examination showed swelling in her right hand and forearm, more than her left, with positive Phalen's maneuver on the right and tenderness to palpation of her right lateral epicondyle.  Dr. Dhoopar diagnosed carpal tunnel syndrome and epicondylitis (tennis elbow) on the right.  (Tr. 642).

On August 30, 2016, Gora went to urgent care complaining of numbness and tingling in both hands and her right elbow.  (Tr. 627).  The doctors were concerned that the numbness and tingling could have been caused by nerve impingement instead of carpal tunnel/tennis elbow, so they recommended that she undergo nerve conduction studies.  They also ordered bilateral DME splints.  (Tr. 628).

EMG testing on October 3, 2016, showed findings consistent with carpal tunnel syndrome, "moderate on the left and mild on the right."  There was no evidence of ulnar neuropathy (pinched nerve in the hand and near the elbow.)  (Tr. 717).  Gora continued to complain of numbness, weakness and dropping things.  (Tr. 747).  Physical examination in October 2016 was positive for Phalen's and Tinel's signs in both hands.  (Tr. 750).

On November 11, 2016, Gora met with Dr. Stephen Cheng.  Physical examination showed decreased range of motion in the hands, musculoskeletal tenderness diffusely in both hands, positive Tinel's signs, positive Durkan's signs, as well as mild thenar atrophy.  Gora was not in "acute distress."  Her sensory examination was grossly normal.  Dr. Cheng diagnosed bilateral carpal tunnel syndrome and discussed treatment options.  Gora declined injections because she "does not like shots."  Dr. Cheng recommended night splinting and an exploration of surgical remedies, for which Gora would need "cardiac clearance before any surgery."  (Tr. 738).  On November 15, 2016, Gora met with Dr. Dhoopar for surgical clearance.  (Tr. 732).  She was given an immunization injection and treatment notes indicate that she tolerated it well.  (Tr. 735).

In December 2016, x-rays of Gora's hands showed mild degenerative disease at the base of the distal phalanxes of both thumbs. (Tr. 754, 756). Gora reported she was taking care of her sick mother. (Tr. 758). Examination continued to show positive Tinel's and Durkan's signs with mild thenar atrophy in December 2016. (Tr. 759).

In September 2017, clinical nurse specialist, Ann Harrington, conducted a "disability examination." (Tr. 977-983). Gora reported severe neck, back, leg and hand pain and that she had been experiencing symptoms for three years. Ms. Harrington noted that Gora had not had any "significant treatment" for her conditions. Gora refused injections. (Tr. 977-978). Physical examination showed tenderness to palpation in both the lumbar and cervical spines, with positive sacroiliac joint, ischial and greater tuberosity tenderness, severely reduced trunk and hip range of motion, decreased range of motion in the neck and mild degenerative disease in the cervical and lumbar spine and both hands. Ms. Harrington noted normal motor strength in Gora's upper and lower extremities. Her fine motor coordination was also normal. (Tr. 983). Ms. Harrington discussed with Gora that carpal tunnel surgery would potentially help with radial four digit numbness, but was unlikely to help with her little finger. (Tr. 978). Gora agreed to try to attend occupational therapy and to follow-up when she was ready for surgery. (Tr. 978-979). Gora met with Ms. Harrington on October 26, 2017. Ms. Harrington noted that Gora was positive for 14/18 tender points for pain. (Tr. 1008).

On November 20, 2017, Gora reported to nurse practitioner, Margaret Onyeukwu, that her carpal tunnel in both hands was causing a lot of discomfort. She also stated that she wanted to have surgery but did not have anyone to take care of her mother. (Tr. 1020).

Gora was evaluated again by Ms. Harrington on December 13, 2017. She reported that she could not tolerate physical therapy because it made her pain worse. (Tr. 1026). Ms.

Harrington reviewed x-rays of Gora's cervical and lumbar spine and of her hands from August 2017. An x-ray of her lumbar spine showed multilevel degenerative disc disease with narrowing at L3-4, facet hypertrophy L3-S1 and some sclerosis at L5-S1. An x-ray of her cervical spine showed degenerative disc disease from C4 to C7 with foraminal encroachment of her spinal cord at C5, C6 and C7, with straightening of her cervical lordosis. X-rays of her hands showed mild degenerative disease of the base of the distal phalanxes. (Tr. 1030-1031). She was diagnosed with chronic low back pain and wide spread neuropathic pain. Ms. Harrington continued her prescriptions of Cymbalta and increased her nerve pain medication, Gabapentin. (Tr. 1031).

### 2. Mental Limitations

Gora started receiving mental health treatment in 2015. She received regular mental health treatment throughout 2015 and 2016. (Tr. 560, 567, 573, 579, 584, 590, 595, 601, 606, 611, 616, 741). Mental status examinations during that time period consistently documented anxiety, depression and vague perceptual disturbances. She was prescribed multiple medications, including: Zoloft, Clonidine, Remeron and Klonopin. (Tr. 560). She was diagnosed with panic disorder, major depressive disorder and post-traumatic stress disorder. (Tr. 561).

In March 2015, Gora saw certified nurse specialist, Carol Cardello. Gora reported that she had been coping well but was still having panic attacks when around a lot of people. Examination showed that Gora was cooperative, logical and coherent. Though anxious, Gora's attention and concentration were sustained. (Tr. 610-611).

On July 10, 2015, Gora reported to Ms. Cardello that she was "active in helping both parents" along with her sister. (Tr. 595). She said that she had a lot on her mind but was "stable overall." (Tr. 595-596).

On November 19, 2015, Gora reported that she was more depressed during that appointment because she had lost her brother and sister and was concerned about a "lack of finances." She stated she had run out of antidepressant medication "a few weeks ago and is now affected by the absence of medication." (Tr. 590). Ms. Cardello noted that Gora had sustained attention and concentration and a logical and coherent thought process. Gora planned to restart medication. (Tr. 589-590).

On December 28, 2015, Ms. Cardello noted that Gora was not consistently compliant with her medications. She reported that she still felt depressed and anxious. She spent much of her time with her mother and did not have much time for herself. Ms. Cardello noted that Gora's thought process was logical and coherent, her attention and concentration were sustained, and her judgment and insight were fair. (Tr. 584-585).

On May 16, 2016, Gora reported that she spent "most her time caring" for her sick mother. She was mildly anxious, but had a logical and coherent thought process with sustained attention and concentration. She said she heard voices, but they were "vague and longstanding." She reported "going daily" to methadone meetings and counseling. Ms. Cardello's impression was that Gora was "still stressed but coping." (Tr. 573).

On October 21, 2016, Gora was more depressed and anxious because her father had died. She had been very close to him and reported difficulty coping with the loss. However, her thought process was logical and coherent, and she had sustained attention/concentration. (Tr. 741).

Treatment notes on January 13, 2017 state that Gora's sister had died unexpectedly of septic shock on December 2, 2017, two months after their father died. (Tr. 945). Mental status examinations for January and April 2017 were the same. Gora was noted to be anxious,

depressed and continued to have vague perceptual disturbances. (Tr. 945, 959). Treatment notes from April 2017 state that Gora was overwhelmed by so many recent family losses. (Tr. 959).

In September 2017, Gora began mental health treatment with Ms. Onyeukwu at MetroHealth, who took over for Ms. Cardello after she retired. (Tr. 989). Gora continued to grieve the loss of her sister and father, but reported that she was "doing better." She reported anxiety and depression for around 27 years. She was "the caregiver to her 83-year-old mother." Ms. Onyeukwu opined that Gora's thoughts were logical in form and content. She also noted that her memory, concentration and abstraction were all within normal limits and she had good eye contact. Ms. Onyeukwu continued Gora's prescriptions and ordered follow-up in four weeks. (Tr. 989-990).

Gora followed-up with Ms. Onyeukwu on November 20, 2017. Ms. Onyeukwu's impression was that Gora's symptoms were in partial remission. Mental status examination showed that her memory was within normal limits; her attention and concentration were sustained; she was fully oriented; and she was logical and organized. She exhibited no evidence of paranoia, delusions, or the "perceptual disturbance" she had earlier reported. (Tr. 1020).

C.    Relevant Opinion Evidence

1.    Treating Psychiatrist – Howard Gottesman

A psychiatrist at MetroHealth, Dr. Gottesman, along with Nurse Specialist Carol Cardello, completed two assessments of Ms. Gora's mental residual capacity. Dr. Gottesman signed the first form on January 19, 2017. In this form he opined that Gora could rarely deal with the public; relate to co-workers; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand

remember and carry out complex job instructions; and socialize. Dr. Gottesman also opined there were many mental work activities that Gora could only perform occasionally. (Tr. 921-922).

A couple of months later, on March 9, 2017, Dr. Gottesman completed a different form with seemingly different opinions. On this form, he opined that Gora did not have any marked or extreme limitations. He opined that she had moderate limitations in her abilities to: keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; adapt to changes; and manage her psychologically based symptoms. (Tr 924-925).

Dr. Gottesman retired in April 2017. (Tr. 965). Gora represents that, because of his retirement, there was no opportunity to question him regarding the apparent inconsistencies between his first and second assessments. ECF Doc. 13 at 4.

### 2. State Agency Consultants

On October 27, 2016, state agency consultant, David Knierim, M.D. reviewed Gora's medical records and opined that she could perform light work with frequent use of her hands. This was an adoption of a decision of an ALJ on a prior application issued in March of 2015.[2] (Tr. 412-414, 426). On January 10, 2017, Gail Mutchler, M.D., reviewed Gora's records and generally agreed with the opinions of Dr. Knierim. (Tr. 425-427).

---

[2] The March 2015 hearing decision contained very little discussion of a carpal tunnel diagnosis. It also stated that Gora had normal strength and sensation, was neurologically intact in her upper extremities, and did not require surgery. Gora argues that this decision should not have been adopted because of the updated medical evidence in the record after the decision. (Tr. 389-390). As noted in footnote 1, *supra*, the ALJ also found that he was not bound by the previous ALJ's decision because of new and material evidence. (Tr. 295).

On November 3, 2016, Melanie Bergsten, Ph.D., reviewed Gora's records and opined that she was capable of performing simple, routine tasks in a low stress environment and could have superficial interactions with coworkers and supervisors. (Tr. 409-410). On January 10, 2017, Judith Schwartzman, Psy.D., reviewed Gora's records and affirmed Dr. Bergsten's opinions.

### D. Relevant Testimonial Evidence

Gora testified at the administrative hearing on March 16, 2018. (Tr. 346-367). Gora was 5'4" tall and weighed 135 pounds. (Tr. 348). She lived in a house with her 22-year-old son and her mother, for whom she provided full-time care. (Tr. 347). Gora did not drive and had never obtained a driver's license. (Tr. 348). She dropped out of school in 7th grade and had never held a job. (Tr. 349).

Gora said she could not work due to the effects of anxiety, arthritis and pain in her hands and back, and her need to frequently change positions from sitting to standing. (Tr. 349-350). She took medications that helped with the pain and they did not cause any negative side effects. (Tr. 351, 357). Gora felt that her condition had gotten worse since 2015 due to her physical and mental limitations, which were exacerbated by numerous deaths in her family. (Tr. 351).

On a good day, Gora estimated that she was able to sit for a half hour and stand for fifteen minutes. She was no longer able to lift three to five pounds with her hands. (Tr. 352). Despite her fear of surgeries, she admitted that she needed carpal tunnel surgery because she could no longer function with her hands. She reported that it took her a half hour in the morning to get her hands "uncramped." (Tr. 357). She did not bathe as often as she once did, but otherwise she was able to care for her basic hygienic needs. (Tr. 353).

Gora administered medication to her mother in the morning. (Tr. 353). Her son made a list for Gora of the medications she was to give her mother each day. (Tr. 353, 365). Her mother was able to wash herself. A nurse next door and Gora's son also helped take care of her mother. (Tr. 353-354). Gora no longer did any household chores. Her son and sister helped with chores. She made microwavable meals for her mother. (Tr. 355). She had not gotten surgery on her hands because she didn't think her mother would be able to prepare her own meals. (Tr. 365).

Gora stopped using heroin in 2012. She attended weekly Narcotics Anonymous meetings to maintain her sobriety. She also attended grief therapy sessions. (Tr. 360-361). But she did not like to be around many people and avoided crowds. (Tr. 365). She took medication before meetings and sat in the back while she was there. (Tr. 360-361).

Vocational Expert Adolph Cwik ("VE") also testified at the hearing. (Tr. 367-375). Because none of Gora's claims of error directly relate to the opinions of the VE, I have only briefly summarized his testimony. In short, the VE opined that there were jobs for an individual of Gora's age and education who was limited to light work with additional limitations. (Tr. 372-373). However, if this individual was limited to occasional handling and fingering at either the light or sedentary levels, the only job she could perform would be surveillance system monitor. (Tr. 374). The VE opined that there were approximately 19,500 of surveillance system monitor jobs available at the national level. (Tr. 375).

If the individual's interaction with supervisors was limited to occasional, the number of these jobs that would be available would be eroded by at least 50%. The VE further opined that being limited to occasional interaction with a supervisor would not be feasible because, for at least the probationary period, frequent interaction with supervisors is required. Thus, a limitation to occasional interaction with supervisors would result in no jobs being available. (Tr. 371).

There would also be no jobs available if the individual was off task 20% or more of the workday and/or absent from work two or more days per month. (Tr. 374).

## IV.  The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

4. Gora had the residual functional capacity to perform light work except that she could occasionally climb ramps or stairs; could never climb ladders, ropes or scaffolds; could frequently handle and finger; occasionally balance, stoop, kneel, crouch and crawl; she could not work in environments where she would have concentrated exposure to temperature extremes, humidity, and/or environmental pollutants; she was limited mentally to performing no more than simple, routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) in jobs where she would not have to interact with members of the public or have more than superficial interactions with coworkers and supervisors. (Tr. 301).

9. There were jobs that existed in significant numbers in the national economy that Gora could perform. (Tr. 307).

Based on all his findings, the ALJ determined that Gora was not disabled. (Tr. 308).

## V.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or reweigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's

factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Residual Functional Capacity

Gora argues that the ALJ failed to properly evaluate the evidence in relation to her carpal tunnel syndrome when he determined her RFC. ECF Doc. 13 at 10-13. Gora cites evidence in the record showing that her ability to use her hands was more limited than the ALJ's assessment. She had an EMG confirming her diagnosis and physical examination of her hands showed decreased range of motion, thenar atrophy, positive Durken's sign, positive Tinel's sign and positive Phalen's sign. (Tr. 642, 702, 738, 750). She developed mild degenerative changes in both thumbs. (Tr 754, 756). She consistently reported pain and limitations in the use of her hands, was prescribed bilateral wrist braces, and had surgery recommended. (Tr. 738).

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ determined that Gora could frequently handle and finger. (Tr. 301). This finding conflicted with Gora's statements that she could no longer function with her hands. (Tr. 357). The ALJ discounted Gora's statements regarding the limiting effects of her symptoms because "she has been able to manage her symptoms conservatively with medication, counseling and physical therapy." (Tr. 302). He also reasoned:

> Although she presented with reduced range of motion and tenderness to palpation in the spine and bilateral upper extremities, she largely presented in no acute distress with full strength, normal and symmetrical reflexes, and a normal and independent gait. She refused injections and declined to schedule surgery to address her carpal tunnel syndrome.

(Tr. 302).

The ALJ's decision summarizes Gora's medical treatment with very little analysis explaining the relationship between the medical evidence and his decision. The Commissioner points to sections of the summarized evidence to support the ALJ's decision, such as the fact that Gora was in "no acute distress." The Commissioner also cites sections of the record that call into question Gora's statements regarding her pain and functional limitations. For example, the

Commissioner argues that Gora could not have been her mother's caretaker if she was entirely disabled.  ECF Doc. 15 at 11.  While this inconsistency might have supported the ALJ's findings, this court cannot determine whether it influenced the ALJ because *he* didn't state it in his decision.  ECF Doc. 15 at 11.  Unfortunately, the ALJ provided very little explanation as to how the summarized medical evidence supported his decision.

Moreover, sections of the ALJ's summary of the medical evidence supported a finding of greater limitation in Gora's ability to use her hands.  For example, despite concluding that Gora "declined" surgery, the ALJ's summary of the medical evidence included facts such as, "[i]n November 2017, the claimant reported that her bilateral carpal tunnel syndrome symptoms were bothering her, and she wanted to have surgery, but there was no one else beside her to care for her elderly mother."  (Tr. 304).  This evidence seems inconsistent with a conclusion that Gora "declined" to schedule surgery.  And, the ALJ attached significance to the fact that Gora declined surgery, even though this was not a completely accurate portrayal of Gora's medical history.  (Tr. 302).  The record shows that Gora wanted surgery but felt she couldn't have it because of her mother's situation.  This implies that she was not simply "declining" surgery but did so for other reasons.  Indeed, if the ALJ's conclusion implied that Gora's condition was not as limiting as she alleged because she electively decided not to have surgery, the ALJ's medical summary undermines that notion.  The ALJ should have provided a better explanation on this issue and as to why he rejected Gora's statements regarding her functional abilities with her hands.

The Commissioner argues that substantial evidence supported the ALJ's RFC finding that she could frequently handle and finger, and that may be true.  And, even if substantial evidence would have supported a different finding, the court must affirm the ALJ's decision if it was

supported by substantial evidence.  *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001).

However, the problem with the ALJ's RFC determination is that he rejected Gora's statements

regarding her functional abilities without a sufficient explanation.[3]  A claimant's subjective

symptom complaints may support a disability finding only when objective medical evidence

confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th

Cir. 1989).  Here, objective evidence *did* support Gora's complaints.  As she argues, an EMG

confirmed the diagnosis of carpal tunnel syndrome and physical examination of her hands

showed objective signs of limitation in the use of her hands.  (Tr. 642, 702, 738, 750).

An ALJ is not required to accept a claimant's subjective symptom complaints, however,

and may properly discount the claimant's testimony about her symptoms when it is inconsistent

with objective medical and other evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider

an individual's statements about the intensity, persistence, and limiting effects of symptoms, and

we will evaluate whether the statements are consistent with objective medical evidence and the

other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may

consider several factors, including the claimant's daily activities, the nature of the claimant's

symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any

treatment, and any other factors concerning the claimant's functional limitations and restrictions.

SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also*

*Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ

---

[3] The fact that the Commissioner dedicates a portion of his brief to attacking Gora's credibility confirms that the ALJ did not properly explain his evaluation of Gora's statements.  The Commissioner argues several bases by which the ALJ could have found that Gora's statements regarding the use of her hands were exaggerated.  ECF Doc. 15 at 11.  Unfortunately, the ALJ did not cite any of these reasons or adequately explain why he found Gora's statements to be inconsistent.  (Tr. 302).

properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The ALJ appears to have discounted Gora's statements because she declined shots and surgery.  (Tr. 302).  Her efforts to alleviate her symptoms and the treatment she received were appropriate factors for the ALJ to consider.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  But it was inaccurate to say that Gora simply "declined" surgery.  Even the ALJ's decision indicated that Gora *wanted* surgery, but felt she couldn't have it due to caring for her mother.  (Tr. 304).  Both the medical notes and Gora's hearing testimony confirmed that fact.  (Tr. 357, 1020).  If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  By apparently rejecting Gora's functional ability statements on an inaccurate basis, the ALJ failed to follow SSR 16-3p, 2016 SSR LEXIS 4 *15.  A better explanation of the ALJ's rejection of Gora's statements was necessary so that Gora and this court could have understood his reasoning.

A proper evaluation of the evidence related to Gora's ability to handle and finger, including her own statements, may change the outcome of her claim.  At the administrative hearing, the VE opined that, if Gora was limited to occasional handling and fingering, she would only be able to perform the job of surveillance system monitor.  (Tr. 374).  He estimated that there were only 19,500 surveillance system monitor jobs available at the national level.  (Tr. 375).  But, contrary to the VE's testimony, the job of surveillance system monitor requires a reasoning level of 3, which was higher than Gora's, as determined by the ALJ.  See *Dictionary of Occupational Titles* 379.367-010; ECF Doc. 13 at 12-13.  Consequently, had the ALJ properly evaluated Gora's statements in accordance with SSR 16-3p, 2016 SSR LEXIS 4 *15, he would

likely have found that she was disabled because the VE didn't identify any available jobs she could perform. The court agrees with Gora that the ALJ's failure to properly consider her statements was not harmless error.

The ALJ's RFC determination that Gora was capable of frequent handling and fingering might have been supported by substantial evidence. Indeed, the ALJ relied on the opinions of state agency physicians David Kneirim, M.D. and Gail Mutchler, M.D. who both opined that Gora could frequently handle and finger. (Tr. 305). But those doctors merely adopted the same limitation determined in Gora's prior SSI application. (*Id.*). Accepting their adoptions of the earlier-claim conclusions was inconsistent with the ALJ's conclusion that he was not bound by the findings from the earlier claim due to newly developed evidence. (Tr. 295). Moreover, his finding is in direct conflict with Gora's own statements regarding her functional abilities. Gora's statements were supported by objective medical evidence in the record. And, the ALJ's basis for discounting her statements was questionable. Because the ALJ failed to properly apply SSR 16-3p, 2016 SSR LEXIS 4 *15 and because his decision did not build a logical bridge between the evidence and his RFC finding, the decision must be vacated.

### C. Medical Opinion Evidence

Gora also argues that the ALJ erred by assigning limited weight to Dr. Gottesman's opinions while assigning great weight to the state agency reviewing psychiatrist. At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by

medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons

for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight

given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a

treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

> Regarding Dr. Gottesman's opinions, the ALJ stated:
>
> The undersigned gives partial weight to the opinions of Carol Cardello,
> PHMCNS-BC, and Howard Gottesman, MD.  (Ex. B8F; ex. B9F).  While Ms.
> Cardello is not an acceptable medical source as that term is defined by the
> Regulations, the undersigned is required to evaluate her opinions to the extent that
> they are supported by the evidence of record taken as a whole.  (20 CFR
> 416.913(a)).
>
> * * *
>
> These opinions were issued only a few months apart, yet contain starkly different
> evaluations of the claimant's mental functioning.  The January 2017 opinion is
> less consistent with the record than the March 2017 opinion is, and therefore, it is
> given less weight.  The record, as discussed above, indicates that although the
> claimant suffered from limitations in her ability to perform tasks, handle stress,
> and interact with others, these restrictions are not work-preclusive.  Although Dr.
> Gottesman is an acceptable medical source with a treating relationship with the
> claimant, his opinions are not given controlling weight because they are not
> currently consistent with other substantial evidence in the record that indicates the
> claimant's limitations are not as severe, and they also concern the claimant's
> residual functional capacity, which is an issue reserved to the Commissioner.  (20
> CFR 416.927).  Therefore, these opinions are given only partial weight overall.

(Tr. 306-307).

Clearly, there was a conflict between the two forms completed by Dr. Gottesman.  Gora

acknowledges this problem in her brief and her attorney raised this issue at her hearing.  ECF

Doc. 13 at 15.  The inconsistencies between his opinions may have even been a proper basis for

rejecting *both* of his opinions.  But that is not what the ALJ did.  He found that one of Dr.

Gottesman's opinions was less consistent with the record than the other opinion and assigned

more weight to the opinion he found more consistent with the other evidence.  (Tr. 306)  This

decision might also have been acceptable and in keeping with the agency's regulations.

However, the ALJ didn't explain this finding or cite any evidence to support it. The good reason rule requires more than simply stating that the opinion is "inconsistent with the record." *See Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 551 (6th Cir. 2010).

The Commissioner argues that Dr. Gottesman wasn't even a treating source because he never examined Gora. If the ALJ had made this finding, he may not have been required to provide good reasons for assigning less than controlling weight to Dr. Gottesman's opinion. *See Thacker v. Comm'r of Soc. Sec.,* 99 F. App'x 661, 664 (6th Cir. 2004). However, the ALJ found that Dr. Gottesman *was* "an acceptable medical source with a treating relationship with the claimant." (Tr. 306). Thus, he should have properly explained his decision to assign more weight to one of his opinions and partial weight to the opinions overall. The Commissioner's efforts to discount Dr. Gottesman's treating relationship with Gora might actually appear to have merit, but they did not provide the basis for the ALJ's handling of Dr. Gottesman's opinion. And this court cannot engage in post-hoc rationalization to find the ALJ's analysis of Dr. Gottesman's opinions to have been sufficient.

The Commissioner makes other arguments in support of the ALJ's finding that Dr. Gottesman's January 2017 opinion was inconsistent with other record evidence. However, this court may only review the grounds offered by the ALJ and cannot affirm the administrative action by substituting what it, or the Commissioner, considers to be a more adequate or proper basis. *Harvey v. Comm'r of Soc. Sec.,* 2017 U.S. App. LEXIS 19788 at *18 (6th Cir. 2017); citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947); see also *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 192 (6th Cir. 2009).

The Commissioner argues that the ALJ properly resolved the conflict between Dr. Gottesman's conflicting opinions. The court agrees that the ALJ had the duty to resolve the

conflict between the opinions and that he seemingly resolved it. *See Coldiron v. Comm'r of Soc. Sec.,* 391 F. App'x 435, 439 (6th Cir. 2010). However, because the ALJ considered Dr. Gottesman to be a treating source, he was also required to explain how he resolved the conflict by doing more than offering the conclusory statement that one of the opinions was more consistent with the evidence than the other. *See Friend,* 375 F. App'x at 551.

The Commissioner contends that the ALJ was not required to recontact Dr. Gottesman because he provided insufficient evidence. The court agrees. *See* 20 C.F.R. § 416.920b(b)(2)(i). The claimant – and not the ALJ – has the burden to produce evidence in support of a disability claim. 20 C.F.R. § 416.912(a). Moreover, Gora states that there was no opportunity to contact Dr. Gottesman because he had retired. ECF Doc. 13 at 4. Thus, the ALJ can hardly be faulted for not contacting him. The ALJ did not err in failing to obtain additional opinion evidence; he erred by failing to state good reasons for assigning less than controlling weight to Dr. Gottesman's January 2017 opinions without citing record evidence supporting that decision.

The Commissioner argues that the ALJ did not err in assigning greater weight to the state agency reviewing sources, even though they did not review psychiatric records in the file. The court does not disagree. An ALJ may give great weight to a state agency reviewer's opinion, even when contrary evidence is submitted after the opinion is issued, as long as the ALJ considers the later evidence. *McGrew v. Comm'r of Soc. Sec.,* 343 F. App'x 26, 32 (6th Cir. 2009). And, the ALJ may assign greater weight to a state agency reviewer than to a treating physician if the ALJ properly explains his reasons for rejecting a treating source's opinion. *Norris v. Comm'r of Soc. Sec.,* 461 F. App'x 433, 439 (6th Cir. 2012). But here, the ALJ did not properly explain his reasons for rejecting one of Dr. Gottesman's opinions and assigning partial weight to his opinions overall.

Finally, the Commissioner argues that this court should look back to earlier portions of the ALJ's decision to find support for his decision to assign only partial weight to the opinions of Dr. Gottesman. The court recognizes that such an approach may be appropriate in some circumstances. *See Crum v. Comm'r of Soc. Sec.* 660 F. App'x 449, 455 (6th Cir. 2016). However, in this matter, the ALJ's decision merely recites facts from the medical evidence with little analysis as to how that would support his decision regarding Dr. Gottesman's opinions. His summarized evidence could both support or contradict the rejection of Dr. Gottesman's opinions. Thus, his statement that "the record, as discussed above, indicates that *** [Gora's] restrictions are not work-preclusive," (Tr. 306) lacked the specificity required by the agency's treating physician rule. *See Gayheart*, 710 F.3d at 376; *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011); *Friend,* 375 F. App'x at 551. In failing to adequately explain why he assigned partial weight to Dr. Gottesman's opinions overall, the ALJ failed to properly apply the agency's treating physician rule and his decision must be vacated.

## VI.    Conclusion

Because the ALJ failed to apply proper legal standards and failed to build a logical bridge between his decision and the evidence, the Commissioner's final decision denying Gora's application for Supplemental Security Income benefits must be VACATED and REMANDED for further consideration consistent with this memorandum opinion and order.

Dated: December 17, 2019

Thomas M. Parker
United States Magistrate Judge